15-741-cr
United States v. Edwards

# In the
# United States Court of Appeals
## For the Second Circuit

August Term, 2015

(Argued: March 30, 2016     Decided: August 24, 2016)

Docket No. 15-741-cr

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

OWEN EDWARDS, AKA ED,

*Defendant-Appellant,*

LAMONT MULLER, AKA DELL, AKA CUZ, MARCUS COLVIN, DONALD GATLIN, AKA JITT, JOSEPH ELLIS, LYNDON GORDON, AKA PANAMA, JAVON PRAYLOU, AKA JOC, RODNEY MORGAN, AKA RED, AKA RODNEY BARTON, WHEELER JOHNSON, JERIMY

1

ESCALERA, AKA DJ GADGET, BENJAMIN GREGOR, GERJUAN TYUS, AKA CALI, TIFFANY HARRIS, AMBER HARRIS, LETICIA GOOSBY, AKA TIT,

*Defendants.*[*]

Before:

SACK, RAGGI, DRONEY, *Circuit Judges.*

On appeal from a judgment of the United States District Court for the District of Connecticut (Chatigny, *J.*) revoking supervised release, defendant challenges (1) the court's jurisdiction under 18 U.S.C. § 3583(i) to adjudicate violations formally charged after the scheduled expiration date of supervision, although here involving conduct closely related to the requisite pre-expiration charge and disclosed in connection therewith; and (2) the sufficiency of the evidence supporting the post-expiration charge of new criminal activity related to narcotics.

AFFIRMED.

STEVEN Y. YUROWITZ, Newman & Greenberg LLP, New York, New York, *for Defendant-Appellant*.

[*] The Clerk of Court is directed to amend the caption as set forth above.

MARC H. SILVERMAN, Assistant United States Attorney (Sarah P. Karwan, Sandra S. Glover, Assistant United States Attorneys, *on the brief*), *for* Deirdre M. Daly, United States Attorney for the District of Connecticut, New Haven, Connecticut, *for Appellee*.

------

REENA RAGGI, *Circuit Judge*:

Defendant Owen Edwards was convicted in 2010 in the United States District Court for the District of Connecticut (Robert N. Chatigny, *Judge*) of conspiring to traffic in cocaine and marijuana. He now appeals from a judgment of that court revoking his supervised release on the 2010 conviction and sentencing him to 24 months' incarceration based on four supervision violations: (1) traveling outside the supervision district without authorization; (2) failing to respond truthfully to his probation officer's inquiries; (3) associating without permission with a convicted felon; and (4) committing another crime while on supervision, specifically, conspiracy to traffic drugs and launder drug proceeds. For the first time on appeal, Edwards challenges the district court's jurisdiction to adjudicate violations (2) through (4), claiming that they were impermissibly charged after the scheduled expiration of his supervision term. See 18 U.S.C. § 3583(i) (stating circumstances that permit revocation proceedings after

3

expiration). In any event, he challenges the sufficiency of the evidence to support the fourth violation—the only one to which he did not plead guilty.

To resolve this appeal, we need not—and, therefore, do not—decide the outer limits of a court's jurisdiction to entertain violation charges that are filed after a timely warrant or summons extends jurisdiction, but also after supervision concludes. We conclude only that where, as here, post-supervision charges involve conduct related to the requisite timely charge and the defendant is afforded adequate notice and opportunity to be heard, the district court is empowered to consider the related violations and to base revocation thereon. Because we further conclude that Edwards's sufficiency challenge fails on the merits, we affirm the challenged revocation judgment.

I. **Background**

A. The Underlying Crime of Conviction

On September 2, 2010, Edwards pleaded guilty in the District of Connecticut to conspiracy to distribute and to possess with intent to distribute cocaine and marijuana in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C), 846. On November 18, 2010, the district court sentenced him to 24 months' imprisonment, to be followed by 36 months' supervised release. The 24-month prison sentence

4

reflected a downward departure from the applicable 27-to-33-month Guidelines range, based on the district court's belief that Edwards's Criminal History Category of III "substantially over-represent[ed] the likelihood the defendant will commit other crimes." Gov't App'x 1. Edwards's betrayal of that trust underlies this appeal.

B.    The Initial Violation Charge

Edwards's supervised release—which commenced on December 6, 2011, and was scheduled to conclude on December 4, 2014—was subject to various conditions, including, as relevant here, that he (1) not leave the supervision district without court or probation permission (Standard Condition 1);[1] (2) truthfully answer all probation inquiries (Standard Condition 3); (3) not associate with convicted felons without probation permission (Standard Condition 9); and (4) not commit any federal, state, or local offense (Mandatory Condition 1). See id. at 3.

On June 17, 2014—approximately six months before the anticipated expiration of supervision—a warrant for Edwards's arrest was sought and

[1] Although Edwards was convicted in Connecticut, because he was a resident of the Bronx his supervision district was the Southern District of New York.

5

obtained in the District of Connecticut based on his reported unauthorized travel to Hawthorne, California, on April 8, 2014, in violation of Standard Condition 1. The warrant petition reported that Edwards's presence in California was discovered in the course of a traffic stop, at which time he was found in possession of almost three-quarters of a million dollars, for which he gave conflicting explanations:

> [O]n April 8, 2014, the SD/NY was contacted by the Hawthorne California Police Department and advised [that] Edwards has been initially detained in that city during a traffic stop. Mr. Edwards did not have the prior authorization from . . . probation to be in California on that date. In summary, Mr. Edwards was operating a rental vehicle [that] he was not authorized to operate. Upon obtaining the assistance of a K9 unit, police discovered a black duffle bag in the front passenger side of the floor board, which contained approximately $700,000. Mr. Edwards denied knowledge of the content of the bag and continues to maintain this position. This matter remains under investigation. Upon being interviewed by the probation officer, Mr. Edwards advised that he traveled to California during April 7, 2014 to April 14, 2014, for his birthday and intended to attend the "Coachella Music Festival." Mr. Edwards claimed that he went to California without permission of the probation officer as he believed that the probation officer would not have provided him with permission to travel out of district on such short notice.

Id. at 10. Edwards was arrested in New York on July 30, 2014, released on his own recognizance, and directed to appear in Connecticut for a violation hearing on September 9, 2014.

Before that appearance, on August 15, 2014, the U.S. Probation Office for the District of Connecticut (hereinafter "Probation") submitted to the court a report formally charging Edwards with violating Standard Condition 1, and providing further details as to the April 8, 2014 traffic stop and the events that followed:

> [W]hile Mr. Edwards was operating a vehicle bearing California license 8N58898, he was pulled over during a traffic stop. Upon interviewing Mr. Edwards he was temporarily detained by police once it was determined that he was on federal supervised release. It was reported that Mr. Edwards immediately invoked his [F]ifth Amendment right without being admonished of a Miranda [w]arning. Police searched Mr. Edwards and the vehicle and uncovered an Avon Car Rental agreement under the names of Robert Lefny and Escabi Martinez, with an address out of Miami, Florida. Police contacted Avon Car Rental and the company indicated that they had no record of Mr. Edwards being an authorized driver of the vehicle. Police called Robert Lefny, one of the noted vehicle renters, and he initially denied that he knew who Mr. Edwards was and then immediately disconnected his telephone connection with police.

At that point, police requested the assistance of a K9 unit as they believed that Mr. Edwards may have been involved in trafficking narcotics. The K9 subsequently located a black duffle bag in the front passenger side of the floor board which was an indication that the K9 was giving a response to the odor of narcotics. When police removed the duffle bag from the vehicle [it] was found to have contained $712,741 in cash, which was wrapped in food saver type vacuum sealed packages. There were no narcotics located in the vehicle. Mr. Edwards indicated to police that he did not know what was contained in the duffle bag until police had opened it.

On April 24, 2014, [U.S. Probation Officer ("USPO") Michael F.] Wasmer interviewed Mr. Edwards at the probation office (SD/NY). With regard to the unauthorized travel out of the Southern District of New York to California during April 7, 2014 to April 14, 2014, Mr. Edwards claimed that he traveled to California without permission of the probation officer for his birthday and in order to attend the "Coachella Music Festival." Mr. Edwards claimed that he went to California without permission as he believed that the probation officer would not have provided him with permission to travel out of district on such short notice. Mr. Edwards further claimed that he was operating a rented vehicle and was on his way to the music festival and he had assumed that the vehicle had been rented by a friend that he was staying [with] while in California. Mr. Edwards further stated to the USPO that he did not know that hundreds of thousands of dollars in cash [were] in a duffle bag hidden in the rental vehicle that he was operating. Mr. Edwards claimed that the money was likely associated with payments for performers at

the Coachella Music Festival who[] would be making "walk through guest appearances" during the festival.

App'x 21–22. The report further stated that, after his April 24 Probation interview, Edwards secured counsel who requested that the confiscated $712,741 be returned to his client.

## C.   Edwards Pleads Guilty to the Initial Travel Violation

On September 9, 2014, the district court confirmed that Edwards and his attorney had received and reviewed the August 15, 2014 violation report, as well as other documents made part of the court record, i.e., (1) the Hawthorne, California, Police Department's report on the April 8, 2014 traffic stop;[2] (2) a May 19, 2014 letter to the Orange County Regional Narcotics Suppression Program from California attorney Roger Jon Diamond, who sought return of the seized $712,741 on behalf of Edwards; (3) a July 1, 2014 letter from Diamond to the FBI seeking return of the $712,741, this time on behalf of both Edwards and "Joseph Reddick," whom Diamond described as the owner of the seized currency; (4) a

---

[2] The police report contained additional details regarding the traffic stop, including that officers had seized three cell phones from the vehicle Edwards had been operating. It concluded with the reporting officer's professed opinion, based on the detailed circumstances, that the seized currency "was the proceeds from narcotic sales and trafficking." Gov't App'x 66.

sworn statement signed by Edwards claiming that the seized currency belonged to him "and/or possibly Joseph Reddick," Gov't App'x 74; and (5) a similar sworn statement by Reddick, who stated that because "[t]he issues are complicated," he and Edwards would "resolve among ourselves who actually is entitled to the money," id. at 73. Edwards confirmed for the court that he was, in fact, pursuing a claim for return of the seized currency.

Defense counsel then stated that Edwards was prepared to admit the charged travel violation, but requested a short continuance to assemble "information [for] the Court regarding that money and that situation out there." App'x 28. Counsel explained that, although he hoped "to some degree to make the sentencing, as it should be, about the . . . admitted [travel] violation," as to the seized currency, he did not want "to leave that elephant in the room out there," noting, "I do have an explanation for that but I wanted to back it up with something." Id. The government agreed to a continuance, explaining that it also intended to present further evidence, including "documents associated with other trips that were taken." Id. at 29.

10

Edwards then formally pleaded guilty to the unauthorized travel violation, whereupon the court adjourned the proceeding to October 1, 2014, so that the parties could offer "information relevant to determining the appropriate sanction." Id. at 33–35. At Edwards's request, the court also remanded him pending sentencing.

D.   The Government's September 30, 2014 Sentencing Memorandum

On September 30, 2014, the government filed its sentencing memorandum, describing further conduct by Edwards that violated conditions of his supervised release.

Specifically, the government reported that Edwards's violation of Standard Condition 1 was not limited to his April 2014 travel to California. Between January 2013 and April 2014, Edwards had made approximately 15 unauthorized trips to Alabama, California, Maryland, Nevada, New Jersey, North Carolina, and Washington, D.C., as evidenced by airline, train, car rental, and hotel records. Such travel had cost several thousands of dollars despite Edwards's reported unemployment.

11

The government stated that Edwards had also violated Standard Condition 9 by his unauthorized association with Reddick, who had a 1993 federal felony conviction for drug trafficking.

The government further asserted that Edwards had lied to Probation (as well as to the Hawthorne police) when he initially professed unawareness of the three-quarters of a million dollars found in the car he was operating on April 8, 2014, as evident from his subsequent assertion that the money was his.[3]

Finally, the government maintained that the totality of reported circumstances pointed to "one, and only one, reasonable conclusion: that Edwards ha[d] resumed his illegal activities . . . most likely drug trafficking, money laundering, cash reporting violations, income tax violations, or gambling (and any combination of those activities)." Gov't App'x 31. Such criminal conduct would have violated Mandatory Condition 1 of supervision.

---

[3] Edwards's failure truthfully to respond to Probation inquiries—whether about his income generally or about the seized money in particular—would have violated Standard Condition 3 of his supervision, although the government did not explicitly cite that condition in its letter.

The government did not urge that Edwards be formally charged with any further violations of supervision. Rather, it relied on the conduct detailed to argue that, even though Edwards's April 2014 travel to California was a Grade C violation that, by itself, triggered an advisory Guidelines range of only 5 to 11 months' imprisonment, see U.S.S.G. §§ 7B1.1(a)(3)(B), 7B1.4(a), the court should impose a sentence at the statutory maximum of 24 months, see 18 U.S.C. § 3583(e)(3). The government observed that, despite Edwards's receipt of a downward departure on his original sentence, he had "consistently" violated supervision conditions "in the most flagrant ways." Gov't App'x 32; see U.S.S.G. § 7B1.4 cmt. n.4 (stating that upward departure at revocation may be warranted where underlying sentence reflected downward departure). It maintained that, in these circumstances, only a 24-month sentence would provide adequate deterrence and promote respect for the law.

E.     The District Court's First Request for an Amended Probation Report

On October 1, 2014, defense counsel confirmed that he had received and reviewed with Edwards the government's September 30, 2014 memorandum and attachments thereto. He urged that the court sentence Edwards within the applicable 5-to-11-month Guidelines range for a Grade C violation, and proffered

13

various documents to dispel concern that Edwards had resumed drug trafficking. Among these documents was a notarized letter from Reddick, dated September 4, 2014, swearing that he was Edwards's "[b]acker" in high-stakes poker games. Gov't App'x 124. Defense counsel asserted that the "vast majority" of Edwards's travel was to play poker, with additional trips reflecting business travel with his girlfriend. App'x 51. Thus, while effectively admitting that Edwards had repeatedly violated the travel condition of his supervision,[4] counsel maintained that such multiple Grade C violations did not increase the recommended 5-to-11-month Guidelines range, see U.S.S.G. § 7B1.1(b), and that the government should not be allowed to urge the higher 18-to-24-month range applicable to "a Grade A violation [for commission of another crime] without going through the process of establishing a Grade A violation," App'x 49.

The district court determined that it "ma[d]e sense" for Probation to file an amended report addressing "what appears to be a pattern of violations" in order to afford Edwards "adequate notice of the charges that the Court really ought to

[4] Defense counsel conceded, "[W]hat's clear was that he was traveling without permission and he wasn't honest to his probation officer. And there's no dispute about that, no dispute at all." App'x 49.

14

be taking into account." Id. at 49–50. As the government explained, it did not yet have a "full picture" of Edwards's conduct, and its investigation was ongoing. Id. at 43. It reported that, since filing its September 30, 2014 memorandum, it had learned that the two names listed on the rental agreement for the car Edwards was driving on April 8, 2014, in fact belonged to one individual: Lefny Roberto Martinez-Escabi, a felon with drug-related convictions in New Jersey and North Carolina. To the extent that Edwards had associated with Martinez-Escabi, the government asserted that such conduct represented another supervised release violation. See id. at 42.

Defense counsel opposed the court's proposal for an amended report, arguing that "what this hearing's about is a Grade C violation." Id. at 50. The district court disagreed, stating:

> [O]n the face of it, we have an individual on supervised release who reports that he is unemployed and trying to find work; he offers no indication that he is leaving the district; and he is apprehended with approximately three quarters of a million dollars in cash in California in a vehicle alone; he claims he had no idea that there was any cash in the vehicle; and now he is seeking to recover the cash on the ground that it was actually his; and it turns out that he was apparently traveling more

15

or less constantly across the country, which costs quite a bit of money, associated with convicted felons.

For me to proceed that this is simply a Grade C failure to notify of travel outside the district would be I think a clear breach of my responsibility as the presiding judge. . . .
I think this is a very serious matter. It's not just a Grade C matter, as far as I can tell. I think that we should have an amended report that provides fair notice of exactly what the probation office's concerns truly are and gives the defense adequate disclosure in the report itself of the basis for the probation office's concerns.

If the probation office wants to take the position that there was a Grade A violation here, one that can be demonstrated by a preponderance of the evidence, then it will have an opportunity to do so.

Id. at 50–52.

The district court continued the proceeding to December 3, 2014, the eve of the scheduled end of Edwards's supervision term.

F.    Adjournment to January 14, 2015

By November 28, 2014, Probation had not yet filed an amended petition. This prompted the government to seek adjournment of the scheduled December 3, 2014 proceeding to January 14, 2015. Edwards did not oppose the request, which the district court granted on December 1, 2014.

16

G.    Probation's Amended Violation Report

On December 23, 2014, after Edwards's supervision had concluded, Probation filed an amended report charging Edwards with four violations of supervision.  First, as to Standard Condition 1, the report expanded the original charge to include Edwards's numerous trips outside the supervision district in 2013–14.  Second, it charged Edwards with violating Standard Condition 3 by failing truthfully to answer Probation inquiries about the seized $712,741.  Specifically, Probation alleged that Edwards necessarily lied when he initially told USPO Wasmer that he was unaware that this money was in the car, because he later claimed that the money was his and represented poker winnings that he was transporting from Las Vegas to the Coachella Music Festival to pay entertainers.  Third, the report charged Edwards with violating Standard Condition 9 by associating with convicted felon Reddick.  Fourth, it charged Edwards with violating Mandatory Condition 1 by engaging in further criminal activity on supervision, because, even taking Edwards at his word—that the seized $712,741 was unlicensed gambling proceeds—the transportation of money so derived to pay entertainers evidenced money laundering.

17

H.     The Resumed Violation Proceeding

On January 14, 2015, Edwards and his counsel each confirmed receipt and review of the amended violation report, raising no objection—and, specifically, no timeliness objection—to the newly charged violations. Indeed, defense counsel stated that his client admitted the Standard Condition 1, 3, and 9 violations, and denied only the Mandatory Condition 1 charge of money laundering. As to that violation, counsel observed that he had expected to have to defend against drug trafficking. Insofar as Probation accused Edwards of laundering gambling proceeds, he argued that the charge failed because a gambler's winnings were not proceeds of his unlawful activity under the relevant statutes. The government disputed this construction of the law, but the district court stated that it was not inclined to resolve that issue when, in fact, the case did not appear to be about gambling proceeds. Rather, "this case looks like drug trafficking." App'x 116.[5]

------

[5] The district court explained:

> You've got $700,000 in vacuum sealed cash in the possession of a person on supervised release who says he doesn't know about the cash, he was unaware of the

18

Thus, the court adjourned the proceeding again so that Probation could submit a document providing Edwards with "adequate notice" that the new criminal conduct the court would consider was drug trafficking and laundering drug trafficking proceeds. Id. at 119. It stated, "[T]hat's a better way to proceed than for me to pretend that the drug trafficking is not what's really going on here and [to] sentence Mr. Edwards based on Grade C violations alone. I just think that would be a miscarriage of justice." Id. Defense counsel voiced no objection.

---

cash, and then later guesses that maybe it was going to be possibly used to pay performers, and then later says, well, actually I won that money playing poker and I was going to use at least part of it to pay performers. . . .

It seems to me implausible that they were poker winnings. I'm not aware that people who are unemployed on supervised release with no disclosed history of any involvement in poker have such skill that they are able to amass nearly three quarter[s] of a million dollars in cash at an underground game and they transport it in a vacuum sealed manner. That just doesn't ring true. That seems . . . preposterous. So I'm left with circumstantial evidence that strongly suggests this was drug trafficking.

App'x 116–17.

I.      The Second Amended Petition and the District Court's Violation Findings

On February 11, 2015, Probation submitted the requested second amended violation report and, at a February 23, 2015 hearing, the district court confirmed that Edwards and his counsel had received it and had no objection to continuing the proceeding.

The government then discussed newly submitted documentary evidence demonstrating that, throughout Edwards's supervision, he had made frequent trips to Las Vegas, where he had rented cars or vans, returning the vehicles several days later with between 1,600 and 2,200 additional miles.[6]  The government argued that these trips manifested a pattern of behavior consistent with that of drug couriers.  It further argued that Edwards's proffered explanation—that he was transporting gambling proceeds from Las Vegas to Coachella when he was stopped in Hawthorne—was implausible because Edwards (1) had arrived in Las Vegas only 29 hours earlier, a relatively brief time

---

[6] Addressing its delay in obtaining and presenting this evidence, the government explained, "Every string we've pulled has led to another set of strings.  So we've tried to best present our understanding of what Mr. Edwards has been up to for the past two years."  App'x 147.

within which to win three-quarters of a million dollars and travel to California; (2) was driving a different vehicle in California from the one he had rented in Las Vegas; (3) was not an authorized driver of the stopped vehicle, which had been rented in Los Angeles by Martinez-Escabi; (4) would not have traveled through Hawthorne if he had been driving from Las Vegas directly to the Coachella Festival;[7] and (5) ultimately returned his Las Vegas rental with 2,183 additional miles.

Although defense counsel continued to maintain that the seized money represented Edwards's gambling winnings, the district court rejected the argument as "implausible." App'x 171. The court concluded that "objectively looking at the totality of the circumstances a reasonable person would have to conclude that the money found in the truck constituted the proceeds of drug

---

[7] The annual Coachella Music Festival takes place in Indio, California, which is approximately 250 miles southwest of Las Vegas, Nevada. Hawthorne, California, is a town in southwest Los Angeles County, which is approximately 130 miles west of Indio.

trafficking." Id. at 170–71.[8] The court observed that Edwards's "shifting explanations" for the money "undercut his credibility with regard to the source of that cash." Id. at 171. Insofar as Reddick supported Edwards's gambling account, the district court declined to credit Reddick given his own significant narcotics trafficking history. In any event, the district court further found it "implausible" that Edwards had "arrived in Las Vegas, rented a car at around midnight on the 7th, won three quarters of a million dollars playing poker and was innocently going about his business as an entrepreneur when he was stopped in the truck rented by a person who himself has a significant history of drug trafficking and who abruptly hung up" when contacted by law enforcement officers who asked about Edwards. Id. at 172. Accordingly, the district court found that Edwards had violated Mandatory Condition 1 of his supervised release by conspiring to traffic in drugs and to launder drug proceeds.

---

[8] While the district court also found it more likely than not that Edwards had committed money laundering, this conclusion was based on its finding that the $712,741 constituted drug trafficking proceeds. See App'x 176.

22

In so ruling, the district court acknowledged that it was "unusual" for violation proceedings to span four court appearances and to require multiple amended reports, but explained why that was necessary in Edwards's case to understand the actual breach of trust represented by his conduct:

> The Court's role is to look carefully at what has happened while the person has been on supervised release in order to make an appropriate decision with regard to how to proceed.
>
> . . .
>
> I suppose it would have been expedient if I had simply accepted [the] admissions [to violating Standard Conditions 1, 3, and 9] and sentenced Mr. Edwards to whatever sanction I thought was appropriate on the record before me. I didn't do that because this case is really about something quite a bit more serious. Granted the pattern of travel violations, the association with convicted felons, whether it's Mr. Reddick or others, the failure to provide truthful accounts to the probation office, those are serious. I don't suggest that they are less than serious. But one could commit those violations without reverting to drug trafficking, and were I to ignore the drug trafficking aspect of it, I think that I would be kidding myself and not doing what my responsibility requires, which is to try to understand what happened.

Id. at 174–75.

In considering a sentence, the district court outlined the 18 U.S.C. § 3553(a) factors, reviewed the various advisory Guidelines ranges for different grade

23

violations of supervision under both Criminal History Categories II and III, and noted Edwards's receipt of a downward departure at his original sentencing. In so doing, the court observed that Edwards's violations demonstrated "a pattern of breaches of trust," whereby Edwards had "connived to conceal from the probation office . . . what he was doing while on supervised release, and I think that what he was concealing [i.e., drug trafficking] is conduct of a serious nature making his breach of trust extremely serious." Id. at 177–78. Indeed, insofar as Edwards continued to deny drug trafficking and urged the court to believe that he was "a remarkably gifted poker player, something we never heard before, knew nothing about, whose only breach of trust was leaving the area without permission and having Mr. Reddick as a backer," the court concluded that Edwards's "deception continues." Id. at 178.

On this record, the district court concluded that its original sentence had been insufficient to deter Edwards from continuing criminal activity, and that the maximum 24-month sentence was necessary to provide adequate deterrence, both specific and general, and to reflect the seriousness of Edwards's breach of trust perpetrated over a long period of time. Accordingly, the court ordered

24

Edwards incarcerated for a total of 24 months, without distinguishing among the various violation charges, to be followed by an additional one-year term of supervised release, which Edwards is currently serving.[9]

## II.   **Discussion**

### A.   Standard of Review

Edwards submits that the district court exceeded its authority in revoking his supervised release based on certain violations formally charged only after the expiration of his supervision term.  In support, he cites 18 U.S.C. § 3583(i), which extends a court's jurisdiction over supervised release violations in the following circumstances:

> The power of the court to revoke a term of supervised release for violation of a condition of supervised release . . . extends beyond the expiration of the term of supervised release for any period reasonably necessary for the adjudication of matters arising before its expiration if, before its expiration, a warrant or summons has been issued on the basis of an allegation of such a violation.

---

[9] Bureau of Prisons records show that Edwards was released from custody on June 3, 2016.  Accordingly, he will be on supervision until June 3, 2017.

Edwards maintains that this language limits a court's extended revocation authority to violations charged before a defendant's supervision term concludes.

The government urges us to review Edwards's claim only for plain error in light of his failure to raise it in the district court. See Fed. R. Crim. P. 52(b). We are mindful that Edwards not only voiced no timeliness objection to charges filed after December 4, 2014, but, in fact, admitted three such violations (pertaining to additional unauthorized travel, unauthorized association with a convicted felon, and failure to respond truthfully to Probation inquiries). Edwards responds that any forfeiture is immaterial here because § 3583(i) delineates extended jurisdiction, requiring de novo review in any event. See United States v. Cotton, 535 U.S. 625, 630 (2002) (stating that "defects in subject-matter jurisdiction require correction regardless of whether the error was raised in district court"); see also, e.g., United States v. Spencer, 640 F.3d 513, 518 (2d Cir. 2011) (reviewing revocation "jurisdiction" challenge de novo). The government concedes that § 3583(i) includes a "jurisdictional component," but maintains that Edwards's challenge does not pertain to jurisdiction as defined in Cotton, see 535 U.S. at 630 (defining "jurisdiction" as "courts' statutory or constitutional power to

adjudicate the case" (emphasis in original) (internal quotation marks omitted)), but, rather, to the permissible <u>scope</u> of judicial inquiry into supervision violations once jurisdiction has been established by a timely filed warrant or summons, <u>see</u> Gov't Ltr. May 6, 2016, at 3–4, ECF No. 96 (arguing that issuance of June 17, 2014 arrest warrant triggered subject-matter jurisdiction to adjudicate any violation charged during revocation proceeding).

We need not decide whether Edwards's particular § 3583(i) challenge is jurisdictional so as to require <u>de novo</u> review despite forfeiture because we here determine that, in any event, his argument fails <u>de novo</u> review.[10]

---

[10] We note that the Ninth Circuit has construed 18 U.S.C. § 3565(c)—which uses language akin to § 3583(i) in discussing probation revocation—as establishing a jurisdictional rule, compliance with which is reviewed <u>de novo</u>, notwithstanding a failure to object in the district court.  <u>See</u> <u>United States v. Pocklington</u>, 792 F.3d 1036, 1039 (9th Cir. 2015) (holding that statutory language—"defining the '<u>power</u> <u>of the court</u> to revoke a sentence of probation'—could hardly speak more clearly to the district court's jurisdiction-defining '<u>power</u> to adjudicate the case'" (quoting first 18 U.S.C. § 3565(c) (emphasis in <u>Pocklington</u>), and then <u>United</u> <u>States v. Cotton</u>, 535 U.S. at 630 (emphasis in <u>Cotton</u>))).  In reaching this conclusion, the Ninth Circuit cited our decision in <u>United States v. Janvier</u>, 599 F.3d 264 (2d Cir. 2010).  <u>See</u> <u>United States v. Pocklington</u>, 792 F.3d at 1040.  <u>Janvier</u>, however, did not address the question before us now, <u>i.e.</u>, whether all § 3583(i) challenges are necessarily jurisdictional and, therefore, not subject to forfeiture.  <u>Janvier</u> held that, where a warrant was ordered, but not timely

27

B. **The District Court Did Not Exceed Its Extended Authority Under 18 U.S.C. § 3583(i) by Revoking Supervised Release Based on the Four Violations Found**

1. **The Plain Statutory Text Supports the Exercise of Extended Authority as to All Violation Charges in this Case**

In considering <u>de novo</u> the post-expiration revocation power conferred on district courts by § 3583(i), we necessarily begin with the statutory text because we assume that "the ordinary meaning of that language accurately expresses" Congress's intent. <u>Hardt v. Reliance Standard Life Ins. Co.</u>, 560 U.S. 242, 251 (2010) (internal quotation marks omitted); <u>accord</u> <u>United States v. Shellef</u>, 718 F.3d 94, 102 (2d Cir. 2013) ("Statutory analysis necessarily begins with the plain meaning of a law's text and, absent ambiguity, will generally end there." (internal quotation marks omitted)). Thus, we consider first "whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." <u>Roberts v. Sea-Land Servs., Inc.</u>, 132 S. Ct. 1350,

---

"issued"—the express statutory trigger for extending a court's revocation authority—the district court lacked the power to adjudicate the underlying violation petition after supervision expired. <u>See</u> 599 F.3d at 265, 269. Because the defendant had objected on this ground "[t]hroughout" the district court proceedings, <u>id.</u> at 265, <u>Janvier</u> had no occasion to consider what, if any, unpreserved § 3583(i) challenges might be deemed forfeited.

28

1356 (2012) (internal quotation marks omitted).  In conducting that analysis, we give effect to all of a statute's provisions, "so that no part will be inoperative or superfluous, void or insignificant."  Corley v. United States, 556 U.S. 303, 314 (2009) (internal quotation marks omitted).  We also follow the "cardinal rule that statutory language must be read in context since a phrase gathers meaning from the words around it."  General Dynamics Land Sys., Inc. v. Cline, 540 U.S. 581, 596 (2004) (alteration, brackets, and internal quotation marks omitted).  Where the statutory text is unambiguous, no further inquiry is necessary.  See United States v. Messina, 806 F.3d 55, 67 (2d Cir. 2015) (citing Robinson v. Shell Oil Co., 519 U.S. 337, 340 (1997)).  This is such a case.

Section 3583(i), by its terms, extends

> [t]he power of the court to revoke a term of supervised release for violation of a condition of supervised release . . . beyond the expiration of the term of supervised release for any period reasonably necessary for the adjudication of matters arising before its expiration if, before its expiration, a warrant or summons has been issued on the basis of an allegation of such a violation.

This language plainly states that extended jurisdiction arises only upon issuance of a violation warrant or summons before expiration of supervision and pertains only to matters arising before expiration of supervision.  But no language states

29

that, once timely triggered, a court's extended revocation authority is limited to the violation alleged in the triggering warrant even when adjudication of relevant matters reveals further violations.

In urging that narrow construction, Edwards argues that the statute's final phrase—"such a violation"—must be considered ambiguous because it can reasonably be construed to refer back to the first clause, so as to require equivalency between the charged violation triggering extended jurisdiction and the proved violation supporting revocation. See Appellant's Br. 22–23 (citing United States v. Thomas, Nos. 11-CR-719, 11-CR-693, 02-CR-441, 2013 WL 5505363, at *3, 2013 U.S. Dist. LEXIS 143594, at *9 (E.D.N.Y. Oct. 3, 2013) (recognizing possibility that § 3583(i) reference to "'such a violation' is a shorthand way of referring to the earlier 'violation of a condition of supervised release'" (emphasis in original)). The argument is unconvincing because if that had been Congress's intent, it would have referred simply to "such violation," without use of the indefinite article, "a," which generally implies the possibility of a larger number than one. See Public Citizen, Inc. v. Mineta, 340 F.3d 39, 54 (2d Cir. 2003). To be sure, an article alone cannot always resolve a matter of

statutory construction, and, as the ensuing discussion shows, we look to other aspects of statutory text in identifying Congress's intent as to the exercise of extended jurisdiction. We here note simply that when the phrase relied on by Edwards—"such a violation"—is construed to account for Congress's use of the indefinite article, it is more naturally understood to reference the <u>type</u> of violation previously identified in the statutory text, <u>i.e.</u>, "violation <u>of a condition of supervised release</u>." 18 U.S.C. § 3583(i) (emphasis added). So long as a warrant or summons is timely issued for "such a violation," § 3583(i) extends the court's "power . . . to revoke a term of supervised release for violation of a condition of supervised release." Nothing in this clause indicates that the "power . . . to revoke," once extended, is limited to the particular violation alleged in the triggering warrant.

Notably, the three of our sister circuits to have considered the question have all declined to construe § 3583(i) as Edwards urges here. The Fifth Circuit has ruled that the phrase "'[s]uch <u>a</u> violation,' which pertains to the basis for the requisite issuance of a pre-term-expiration warrant, refers to . . . <u>any</u> violation of a condition of supervised release during the term, <u>not</u> just the one on which

31

revocation is ultimately based." United States v. Naranjo, 259 F.3d 379, 382 (5th Cir. 2001) (emphases in original). The Eleventh Circuit has similarly concluded that, once a defendant on supervised release is properly before the court on a timely warrant or summons, the court has "the power to consider any violation of the terms of the release and base a revocation on it." United States v. Presley, 487 F.3d 1346, 1349 (11th Cir. 2007). Relying on these two decisions, the Fourth Circuit has reached the same conclusion summarily. See United States v. Brennan, 285 F. App'x 51, 57 n.2 (4th Cir. 2008).

As earlier noted, we need not here delineate the full range of violations that can be charged post-supervision provided a timely warrant or summons is issued. We conclude only that the plain language of § 3583(i) empowers a district court to revoke supervised release based on such additional violations where, as here, those violations involve conduct related to the violation charged in the timely warrant, which conduct was disclosed to the defendant so as to afford adequate notice and opportunity to be heard.[11]

---

[11] Two unpublished district court cases relied on by Edwards are distinguishable in that the additional violations charged after supervision expired there were

32

We reach this conclusion by placing the phrase "such a violation" in context.  See United States v. Torres, 703 F.3d 194, 199 (2d Cir. 2012) ("The meaning of a word or phrase cannot be determined in isolation, but must be drawn from the context in which it is used." (brackets and internal quotation marks omitted)).  "[S]uch a violation" is part of a clause whose singular purpose is to identify the requisite trigger for extending a court's revocation power beyond expiration of supervision.  Once that requirement is satisfied, however, a different clause defines the period and purpose for which revocation power is extended, that is, "for any period reasonably necessary for the adjudication of

unrelated to violations alleged in the triggering warrants.  The record in United States v. Thomas shows that the timely warrant therein was based on a state charge for public lewdness in Brooklyn, whereas later charged violations were based on bank fraud and identity theft convictions in the Southern District of New York.  See Gov't Ltr. at 2, United States v. Thomas, No. 11-CR-719 (E.D.N.Y. Sept. 13, 2013), ECF No. 15.  In United States v. Downs, No. 97-MISC.-CR.-80E, 2000 WL 1568598, 2000 U.S. Dist. LEXIS 15397 (W.D.N.Y. Oct. 19, 2000), the district court explicitly observed that the violation charged after supervision "relate[d] to a totally separate and distinct incident occurring several months after the charges contained in the original [p]etition."  2000 WL 1568598, at *2, 2000 U.S. Dist. LEXIS 15397, at *6–7.  We express no view on the application of § 3583(i) in those circumstances.  However, to the extent these decisions might be read to suggest that § 3583(i) never affords courts extended jurisdiction to adjudicate supervision violations alleged post-expiration, no matter how closely they relate to the original triggering violation, we here conclude to the contrary.

matters arising before . . . expiration" of the supervised release term.  18 U.S.C. § 3583(i) (emphasis added).   The plain meaning of the word "matter," particularly when used in the plural, is broad, reaching any "subject under consideration" in resolving a dispute.  Black's Law Dictionary 1126 (10th ed. 2014); see Webster's Third New International Dictionary (Unabridged) 1394 (1986 ed.) (referencing "a fact, an event or course of events, or a circumstance, situation, or question" that is "of interest or relevance"; "something that is a subject of disagreement . . . or litigation").   This necessarily encompasses "matters" relevant to a timely warrant violation that reveal further violations.

To explain, we reiterate that the critical "subject under consideration" at a revocation proceeding is more than a charged violation; it is the breach of trust manifested by the violation, a matter often dependent on attending circumstances.  See generally U.S.S.G. ch. 7, pt. A., introductory cmt. 3(b) ("[A]t revocation the court should sanction primarily the defendant's breach of trust, while taking into account, to a limited degree, the seriousness of the underlying violation and the criminal history of the violator.").   An example makes the point.   Two defendants, each charged with violating the standard travel

34

condition of supervised release, may have breached the court's trust. But the defendant who did so to attend an innocent family celebration might be deemed to have breached the court's trust to a lesser degree than the defendant who did so to engage in new criminal activity. In short, <u>why</u> a defendant engaged in unauthorized travel can be as important to assessing betrayal of trust as <u>whether</u> he engaged in such travel. And so, while only the latter fact is a required element of the alleged travel violation, both are "matters" relevant to assessing the betrayal of trust that a court is authorized to consider by the plain language of § 3583(i).

Further, § 3583(i) empowers a court to do more than simply consider matters relevant to a supervised defendant's betrayal of court trust; it authorizes the matters' "adjudication." Adjudication contemplates final resolution of a dispute. <u>See</u> <u>Black's Law Dictionary</u> 50; <u>Webster's Third New International Dictionary (Unabridged)</u> 27. Thus, where an assessment of the breach of trust reflected by unauthorized travel depends, as here, not only on (1) the fact of the travel, but also on whether defendant (2) traveled in order to commit new crimes, (3) associated with a convicted felon in the course of that travel, and

35

(4) then lied to probation authorities about the circumstances of the travel, we construe § 3583(i) to authorize a district court to adjudicate all four matters, which adjudication naturally would determine not simply the triggering travel violation, but three more related violations.[12]  Congress having thus empowered courts to adjudicate matters manifesting supervision violations beyond those alleged in the triggering warrant, it would make no sense to conclude that it intended to preclude courts from factoring those further violations into revocation decisions.

> 2. Extending Revocation Jurisdiction Here Does Not Conflict with the Relation-Back Rule for Superseding Indictments

Edwards nevertheless tries to support such a conclusion by drawing an analogy to a superseding indictment filed after the statute of limitations has expired, which can relate back to a timely indictment only so long as the

---

[12] That adjudication here necessarily included follow-up investigation into Edwards's unauthorized travel, given his possession of three-quarters of a million dollars in cash and his "shifting tales" regarding the source of the money, all described in the triggering warrant.  Appellee's Br. 31.  The government undertook this investigation from the time Edwards was stopped in California, and Edwards does not assert that such investigation extended beyond a period "reasonably necessary" to adjudicate these travel-related matters.  18 U.S.C. § 3583(i).

36

superseding indictment "does not materially broaden or substantially amend the original charges." United States v. Rutkoske, 506 F.3d 170, 175 (2d Cir. 2007) (internal quotation marks omitted). The argument fails because the relation-back rule does not extend a statute of limitations; rather, it identifies superseding charges that are sufficiently narrow to be filed without violating an expired statute of limitations. By contrast, § 3583(i), by its terms, "extends" the post-expiration "power of the court," so as to empower courts to "adjudicat[e]" relevant "matters" arising before the expiration of supervision. As just demonstrated, it is not unusual for such matters to reveal violations of supervision conditions beyond those charged in a warrant triggering extended jurisdiction.

Edwards's argument also ignores another relevant distinction. Unlike conviction, which punishes the conduct charged in an indictment, revocation does not punish the conduct violating supervised release. Rather, revocation assesses the betrayal of court trust evidenced by the violation. See U.S.S.G. ch. 7, pt. A, introductory cmt. 3(b). It is for this reason that a defendant "may be both punished for the supervised-release violation and prosecuted criminally for the

37

same conduct without implicating principles of double jeopardy." United States v. Carlton, 534 F.3d 97, 101 (2d Cir. 2008) (internal quotation marks omitted). Further, in contrast to additional indictment counts, which can increase the maximum sentence faced by a defendant, neither the number nor the type of supervision violations affects a defendant's maximum sentence on revocation. That is determined by the underlying crime of conviction. See 18 U.S.C. § 3583(e)(3); United States v. Ortiz, 779 F.3d 176, 181 (2d Cir. 2015). To be sure, the Sentencing Guidelines categorize violations in ways that trigger different sentencing recommendations. Thus, unauthorized travel, unauthorized association with felons, and false statements to probation authorities are all Grade C violations yielding (within Edwards's Criminal History Category of III) a recommended 5-to-11-month sentencing range, while new criminal activity is a Grade A violation prompting a recommended 18-to-24-month sentencing range. See U.S.S.G. § 7B1.4. But the fact remains, the ranges are—indeed, have always been—only recommendations, not binding on the court, and not implicating different maximum sentences.

Accordingly, § 3583(i)'s broad allowance for the "adjudication of matters" is properly construed to permit a court exercising extended jurisdiction to base its revocation decision not only on the violation charged in the triggering warrant but on any other violations established by the adjudication of matters related to the initial charge.  A defendant may well have due process rights to notice and response with respect to such further violations, but we are not required on this appeal to decide exactly how these requirements must be satisfied in each case.[13]  We here conclude only that the relation-back rule for

---

[13] Here, it appears that the government was initially content to have Edwards formally charged only with a single unauthorized travel violation, and to treat further unauthorized travel, unauthorized association with a felon, lying to probation authorities, and new criminal conduct—all potential violations of supervision—as matters aggravating the betrayal of trust.  It was when questions were raised about the propriety of holding Edwards to account for uncharged conduct manifesting more serious supervision violations than the charged travel violation that the district court, demonstrating the caution and prudence that characterized its handling of every aspect of this case, ordered unopposed adjournments to allow the filing of amended petitions formally charging these violations.  See, e.g., App'x 115, 118–19 (observing that it would be "a miscarriage of justice" to "pretend" that drug trafficking "is not what's really going on here and [to] sentence Mr. Edwards based on Grade C violations alone"; referencing court's duty at supervised release hearing "to deal appropriately with the information presented to me, whether it's charged or not"; but, mindful of Edwards's "due process right to adequate notice of the

superseding indictments provides no support for Edwards's argument that a district court's extended revocation jurisdiction under § 3583(i) is limited to those violations alleged in the extension-triggering warrant.

        3. <u>Extending Revocation Jurisdiction Here Does Not Conflict with Precedent Construing the Probation-Revocation Statute</u>

Edwards further supports his urged narrow reading of § 3583(i) by citing our observation that § 3565(c)—which employs almost identical language to § 3583(i) in the context of probation revocation—was not intended "to extend the power of the court to revoke probation, but to restrict it." <u>United States v. Morales</u>, 45 F.3d 693, 700 (2d Cir. 1995) (citing <u>United States v. Neville</u>, 985 F.2d 992, 998 & n.13 (9th Cir. 1993)). The argument fails because that observation derived from the fact that § 3565(c)'s predecessor statute permitted revocation to

---

alleged violation" when facing possible two years' imprisonment and potential lifetime supervised release, adjourning proceeding for Probation to amend petition to provide formal notice that court "could find new criminal conduct on the basis of these facts in the form of drug trafficking"). In here concluding that § 3583(i) permitted the district court to revoke supervised release on the basis of additional related violations charged in these post-supervision amended petitions, we do not necessarily foreclose the possibility of such conduct informing a revocation decision even without formal violations being charged, <u>cf.</u> 18 U.S.C. § 3553(a)(1), provided the defendant is given adequate notice of the conduct at issue and an opportunity to respond.

be <u>initiated</u> after a defendant had completed probation. Specifically, "[u]nder the old statute, so long as the warrant or summons issued prior to the five-year maximum term of probation permitted under § 3651, the court retained the power to revoke probation, <u>even if the defendant had received less than five years of probation</u>." <u>United States v. Neville</u>, 985 F.2d at 998 n.13 (emphasis added) (citation omitted). No statute or precedent has ever authorized the revocation of supervised release absent some notice-providing event occurring before expiration of supervision. Thus, the fact that § 3565(c) operates more restrictively than the law it supplanted with respect to probation revocation has little relevance to our construction of § 3583(i).

4. <u>The Close Relatedness of the Violations and the Notice Afforded Defendant Here Support the Exercise of Extended Revocation Authority</u>

Certain questions pertaining to the outer limits of a court's extended jurisdiction under § 3583(i) are not before us on this appeal. Thus, we do not here consider whether, when the violation charged in the triggering warrant is not proved, § 3583(i) empowers a court to revoke supervised release based <u>only</u> on one or more violations charged after supervision has ended. Nor do we here decide whether and to what degree "matters" that can be adjudicated under

§ 3583(i)—including violations charged after supervision has expired—<u>must</u> relate to a violation alleged in the triggering warrant or summons. Here, Edwards was proved guilty—by his own admission—of the unauthorized travel charged in the triggering warrant; and all post-supervision charges, both those admitted by Edwards and the new narcotics crimes found by the district court, involved conduct closely related to the triggering warrant's travel charge.

In these circumstances, § 3583(i) empowered the district court to revoke Edwards's supervised release based on all four violations at issue. Indeed, the link between Edwards's new narcotics crimes and the triggering travel violation might be deemed inextricable in that the former was the motive for the latter. This criminal motive not only confirmed that the unauthorized travel was knowing and willful, but it also significantly aggravated the betrayal of trust reflected by that travel. It was precisely for that reason that the district judge was understandably reluctant to base revocation on only a travel charge and to blink the serious new criminal conduct prompting that travel. <u>See</u> App'x 174–75.

Edwards nevertheless argues that, because the challenged violation alleged a 15-month drug trafficking conspiracy, it did not relate to the triggering

42

warrant's alleged unauthorized travel on April 8, 2014. The argument fails because a conspiracy spanning many months can, of course, relate to a host of discrete acts in furtherance of the scheme. See generally United States v. Pressley, 469 F.3d 63, 65–66 (2d Cir. 2006) (holding that single 21 U.S.C. § 841(b) conspiracy may consist of multiple narcotics transactions); United States v. Olmeda, 461 F.3d 271, 281 (2d Cir. 2006) (recognizing that multiple fraudulent mailings can constitute single continuing scheme (citing United States v. Margiotta, 646 F.2d 729, 733 (2d Cir. 1981))). In any event, in adjudicating the triggering travel violation here, it soon became apparent that the alleged April 8, 2014 travel was part of a pattern of unauthorized travel spanning the same 15-month time frame as the narcotics conspiracy for which the travel was undertaken. Thus, the relatedness of the narcotics trafficking and travel violations is beyond question, whether we consider the single travel violation charged in the triggering warrant or the expanded travel violation charged in the first amended petition.

The same relatedness conclusion obtains with respect to post-supervision charges of Edwards's unauthorized association with the felon Reddick and false

43

statements to probation authorities. Edwards himself admitted that his contact with Reddick related to his April 8, 2014 travel, and the district court expressly found that Edwards's false statements to Probation were part of a pattern of deceit aimed at concealing the real criminal object of his travels.

Nor is there any question here of Edwards's being given adequate notice and opportunity to be heard. Indeed, the Background section of this opinion details how Edwards received notice even before expiration of his supervision term that a host of conduct related to the triggering warrant's single travel violation demonstrated the severity of his breach of trust, specifically Edwards's association with Reddick in connection with the charged unauthorized travel; his lies to Probation about possession of $712,741 during the charged travel; the charged travel's place within a pattern of extensive unauthorized travel; and the inference of new criminal conduct, including drug trafficking, raised by the totality of circumstances.

With particular reference to new drug trafficking crimes, both the initial police report and the August 15, 2014 Probation report advised Edwards that he was found in possession of approximately three-quarters of a million dollars

44

because a trained police dog alerted to the odor of narcotics on the bag containing the money. Subsequent reports advised that both the renter of record of the vehicle Edwards was driving on April 8, 2014, and the person who claimed ownership of the money with Edwards had been convicted of narcotics trafficking. Thus, as early as the initial September 9, 2014 court appearance, Edwards's counsel acknowledged that the possible narcotics-trafficking origin of the seized money was the "elephant in the room," and that he intended to produce evidence to assuage court concern in that regard. Indeed, when Probation later alleged that Edwards could be found to have engaged in money laundering even if the seized cash derived from gambling, as Edwards claimed, counsel asserted that he had expected to defend against narcotics trafficking. Of course, the district court specifically rejected Edwards's claim that the seized money represented gambling winnings and, after the filing of the second amended petition, formally found that the money, in fact, derived from drug trafficking. We address Edwards's sufficiency challenge to this finding in the next section of this opinion. We here decide simply that no due process concern precluded the district court from revoking supervised release based on both the

45

travel violation alleged in the triggering warrant and related adjudicated matters formally charged as violations after supervision expired.

In sum, on <u>de novo</u> review, we conclude that the district court did not exceed its § 3583(i) authority in revoking Edwards's release based on the four violations of supervision found in this case.

C.    <u>The Sufficiency Challenge to Edwards's Violation of Mandatory Condition 1 Fails on the Merits</u>

Edwards argues that, even if the district court did not exceed its authority in revoking his release based on violations charged after supervision expired, the evidence is insufficient to support its finding that he violated Mandatory Condition 1 by engaging in narcotics trafficking or the laundering of narcotics proceeds.

To revoke supervised release and impose a term of imprisonment, a district court must find by a preponderance of the evidence that the defendant violated a condition of his supervision. <u>See</u> 18 U.S.C. § 3583(e)(3). The preponderance standard requires proof that the defendant's violation of supervision was "more likely than not." <u>United States v. Hertular</u>, 562 F.3d 433, 447 (2d Cir. 2009); <u>see</u> <u>United States v. Glenn</u>, 744 F.3d 845, 848 (2d Cir. 2014)

46

(recognizing that standard of proof applicable to revocation proceedings is lower than that required to establish guilt at trial). We review such a preponderance finding only for abuse of discretion, which can consist of an error of law or a clearly erroneous assessment of the facts. See United States v. Glenn, 744 F.3d at 847. Applying that standard here, we identify no abuse of discretion. Indeed, we conclude that the totality of the evidence convincingly supports the district court's preponderance finding.

In urging otherwise, Edwards emphasizes the government's failure to seize any narcotics and argues that his possession of $712,741 does not alone prove narcotics trafficking or money laundering. The argument fails because proof of a narcotics trafficking conspiracy—even proof beyond a reasonable doubt—does not demand a seizure of drugs. See, e.g., United States v. Sureff, 15 F.3d 225, 227–29 (2d Cir. 1994). And while we have suggested that "a large sum of money is not by itself sufficient to establish probable cause" of drug trafficking, United States v. $557,933.89, More or Less, in U.S. Funds, 287 F.3d 66, 88 (2d Cir. 2002), the district court did not here rely only on the fact of the seized

money to support its preponderance finding. Rather, it carefully identified and reviewed the totality of record evidence supporting that conclusion.

Among the identified evidence strongly supporting the challenged finding was (1) the way the seized money was packaged, in bundles within vacuum-sealed, plastic bags, a technique "known to be used by drug dealers to prevent discovery by drug-sniffing dogs," United States v. $242,484.00, 389 F.3d 1149, 1162 (11th Cir. 2004) (en banc); (2) the fact that, despite these concealment efforts, a trained police dog alerted to the odor of narcotics on the duffle bag containing the cash; and (3) Edwards's possession, along with the cash, of three cell phones—multiple cell phone use being a "common practice in the drug trade," United States v. Burkley, 513 F.3d 1183, 1189 (10th Cir. 2008). Such a preponderance finding was reinforced, moreover, by (4) travel and car rental records showing that, in the 15 months before Edwards was found in possession of the seized money, he had made numerous other trips—all in violation of his supervision—that each followed a pattern consistent with transporting drugs or drug revenues, specifically, that (a) Edwards flew to Las Vegas, (b) he there

48

rented a car or van, and (c) a few days later he returned the vehicle showing approximately 2,000 miles in additional travel.

Also supporting the challenged preponderance finding was (5) evidence of Edwards's lies about the seized money: (a) when stopped on April 8, 2014, he initially claimed no knowledge of the money found in the duffle bag; (b) he then repeated this lie to his probation officer; but (c) when Edwards subsequently claimed the money as his own (or his and Reddick's), he concocted a story of winning the money through gambling. As the district court reasonably concluded, it was unlikely in the extreme that a person such as Edwards, with no known history of gambling, would have won three-quarters of a million dollars in little more than a day's time.[14] Instead, Edwards's string of lies, representing what the district court characterized as a pattern of deceit to conceal the criminal origins of the seized money, admitted an inference that Edwards knew he was

---

[14] To the extent Edwards maintains that the evidence was equally consistent with this "legitimate explanation" as with narcotics trafficking, Appellant's Br. 32, the argument is conclusively defeated by the district court's decision not to credit Edwards's or Reddick's accounts of gambling. We accord strong deference to a district court's credibility determinations, and have no reason to disturb them here. See United States v. Carlton, 442 F.3d 802, 811 (2d Cir. 2006).

transporting drug proceeds and intended to further criminal activity related

thereto.  See United States v. Anderson, 747 F.3d 51, 60 (2d Cir. 2014) (observing

that, along with other evidence, "acts that exhibit 'a consciousness of guilt, such

as false exculpatory statements,' may also tend to prove knowledge and intent of

a conspiracy's purpose" (citation omitted) (quoting United States v. Gordon, 987

F.2d 902, 907 (2d Cir. 1993))).[15]

Further admitting an inference of Edwards's culpable knowledge and

intent to traffic drugs or launder drug proceeds was (6) evidence of the narcotics-

trafficking histories (a) not only of Edwards, but also (b) of the renter of record of

---

[15] United States v. Ogando, 547 F.3d 102, 108–09 (2d Cir. 2008), and United States v. Johnson, 513 F.2d 819, 824 (2d Cir. 1975), relied on by Edwards, do not preclude this inference.  Those cases held that defendants' false exculpatory statements were not enough, by themselves, to support guilty verdicts beyond a reasonable doubt.  But that conclusion is not pertinent here, where (1) a lesser preponderance standard applied to the findings of the district court, (2) which did not, in any event, rely primarily on Edwards's exculpatory statements to find it more likely than not that he engaged in new drug-related crimes while on supervision.  Nothing in Ogando or Johnson holds that false exculpatory statements cannot be among the totality of evidence supporting a culpability finding, whether made by a preponderance or beyond a reasonable doubt.

the car Edwards was driving when stopped in possession of the seized money, and (c) of the person who claimed, with Edwards, to own the seized money.[16]

In sum, the totality of the evidence amply supports the district court's preponderance finding that Edwards engaged in new drug trafficking or the laundering of drug trafficking proceeds while on supervision. Accordingly, we reject his sufficiency challenge as meritless.

### III. Conclusion

To summarize, we conclude as follows:

1. The district court did not exceed its jurisdiction in revoking Edwards's supervised release based not only on the violation alleged in the warrant triggering extended jurisdiction under 18 U.S.C. § 3583(i), but also on violations formally charged after supervision expired where, as here, (a) those violations pertained to "matters" closely related to the triggering violation, which § 3583(i) empowered the court to "adjudicat[e]," and (b) there is no due

---

[16] Such evidence likely satisfies Fed. R. Evid. 404(b) (allowing prior bad act evidence to be considered in resolving disputes as to defendant's knowledge and intent), but the question is irrelevant because the Federal Rules of Evidence—except those governing privileges—do not apply at revocation proceedings. See United States v. Bari, 599 F.3d 176, 178–79 (2d Cir. 2010) (citing United States v. Aspinall, 389 F.3d 332, 344 (2d Cir. 2004)).

process concern about the defendant's having adequate notice and opportunity to be heard on these matters.

2.      The record evidence is sufficient to support the district court's preponderance finding that Edwards violated supervised release by committing new crimes related to drug trafficking.

The judgment of the district court is, therefore, AFFIRMED.