*United States v. Ramos*

# United States Court of Appeals
## For the Second Circuit

August Term 2020

Argued:  September 14, 2020
Decided: November 12, 2020

No. 19-4373

UNITED STATES OF AMERICA,

*Appellee,*

*v.*

BETSY RAMOS,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of New York
No. 93-cr-360, Nicholas G. Garaufis, *Judge.*

Before:     LYNCH, SULLIVAN, AND PARK, *Circuit Judges.*

Appellant challenges her 24-month sentence following a violation of supervised release, arguing that the district court (Garaufis, *J.*) could not consider a recidivism enhancement to determine that the violation – commission of a state felony while on supervised release – involved an offense "punishable by a term of imprisonment exceeding twenty years" under U.S. Sentencing Guideline

§ 7B1.1(a)(1)(B). We disagree, and hold that calculation of the term of imprisonment under § 7B1.1(a)(1)(B) includes state law enhancements that increase the maximum penalty for recidivists. Because we conclude that the district court did not err in calculating the applicable Sentencing Guidelines range, and because we disagree with Appellant's assertions that the district court committed other procedural errors during the sentencing hearing, we **AFFIRM** the district court's judgment.

AFFIRMED.

RONALD L. KUBY (Rhidaya S. Trivedi, *on the brief*), Law Office of Ronald L. Kuby, New York, NY, *for Defendant-Appellant*.

M. KRISTIN MACE (Kevin Trowel, *on the brief*), Assistant United States Attorneys, *for* Seth D. DuCharme, Acting United States Attorney for the Eastern District of New York, New York, NY, *for Appellee*.

RICHARD J. SULLIVAN, *Circuit Judge*:

This appeal requires us to decide whether, in grading a violation of supervised release under U.S. Sentencing Guideline § 7B1.1(a), it is appropriate for a district court to consider a state law recidivism enhancement to determine that the violation involved an offense "punishable by a term of imprisonment exceeding twenty years." U.S.S.G. § 7B1.1(a)(1)(B). We hold that it is, and that the district court did not otherwise commit a procedural error in sentencing the defendant, Betsy Ramos, to a two-year term of imprisonment.

2

## I.  Background

Ramos's extensive criminal history began in 1986 when, at the age of twenty-one, she sold a small amount of cocaine to an undercover law enforcement officer. One year later, Ramos was again convicted of selling narcotics to an undercover police officer – this time, heroin. The following year, she was arrested for yet another drug sale, resulting in her third narcotics conviction in as many years and a sentence of two-and-a-half to five years' incarceration.

Almost immediately after her release from prison, Ramos returned to a life of crime. On March 21, 1993 – while still on probation – Ramos arrived at John F. Kennedy International Airport aboard a flight from Bogotá, Colombia. During a routine Customs inspection, it was revealed that Ramos and a coconspirator were acting as drug mules, having ingested dozens of balloons filled with more than 818 grams of heroin.

Four months after her arrest, and facing between five and forty years behind bars, Ramos pleaded guilty, pursuant to a cooperation agreement with the government, to importing heroin into the United States. Given both the severity of her crime and her extensive criminal history – which rendered her a Career Offender – the district court calculated Ramos's Guidelines range to be 151 to 188

months' imprisonment.[1]  Nevertheless, in light of Ramos's cooperation and personal history, the court determined that a substantial downward departure was warranted, and ultimately sentenced Ramos to only 36 months' imprisonment, to be followed by a 10-year term of supervised release.

In 1995, just weeks after moving from prison to a halfway house, Ramos learned that she was HIV positive.  Following that diagnosis, she slipped back into old patterns and began abusing drugs.  It was around that time that Ramos became romantically involved with Joseph Serrano.

As Ramos tells it, "[t]heir relationship was fraught from the beginning." Ramos Br. at 7.  Not only was Serrano a drug user himself, but he was also verbally and physically abusive to Ramos.  And because Serrano was a convicted felon, associating with him put Ramos in violation of her conditions of supervision – a fact which her probation officer warned her about.  Ramos nevertheless stayed with Serrano and even allowed him to move in with her.

On May 26, 1998, two New York City police officers, Anthony Mosomillo

---

[1] At that time, the Guidelines range was mandatory.  But, prior to sentencing, the government submitted a motion pursuant to § 5K1.1 of the Guidelines and 18 U.S.C. § 3553(e), indicating that Ramos had provided substantial assistance to the government.  As a result, the district court had discretion to impose a sentence below that range and below the otherwise applicable five-year statutory minimum.

4

and Miriam Torres, went to Ramos's residence to execute a bench warrant for Serrano's arrest. Ramos lied to the officers and told them that she had not seen Serrano in some time. The officers left, but quickly returned after learning from Ramos's neighbor that there was a trap door in the floor of Ramos's apartment. Sure enough, upon searching her home, the officers located Serrano hiding in that hidden compartment.

After ordering Serrano to step out of the hole, the officers attempted to arrest him. Serrano refused, and after struggling with the officers, managed to get hold of Officer Torres's service weapon. At that point, Serrano and Officer Mosomillo exchanged gunfire, which resulted in the deaths of both men.

The following year, Ramos was tried for her role in Officer Mosomillo's death and was ultimately convicted of second-degree manslaughter – otherwise known as reckless manslaughter – pursuant to New York Penal Law § 125.15. Although the sentence for a class C felony such as second-degree manslaughter typically cannot exceed 15 years' imprisonment, N.Y. PENAL LAW § 70.00(2)(c); *see also People v. Lewie*, 17 N.Y.3d 348, 356 (2011), Ramos's past narcotics convictions rendered her a "persistent felony offender," meaning that she was eligible for a sentence of up to life imprisonment, N.Y. PENAL LAW §§ 70.00(2)(a), 70.10. Ramos

5

was ultimately sentenced to fifteen years to life imprisonment.

More than twenty years later, on December 10, 2019, Ramos was released from state prison and immediately transferred to federal custody, where she was presented on a violation of the terms of her supervised release stemming from the May 1998 shooting. In connection with the federal violation, the U.S. Probation Department determined that Ramos's state offense constituted a "Grade A" violation as defined by U.S.S.G. § 7B1.1(a)(1), and concluded that the applicable Guidelines range was 33 to 41 months' imprisonment. But, as the original offense of conviction was a class C felony, the maximum allowable sentence for the violation was determined to be 24 months. Ramos promptly admitted to the specified violation, and, ten days later, the parties reconvened before the district court for sentencing.

At the sentencing hearing, several friends and family members of Officer Mosomillo appeared and asked to testify about Ramos's role in the shooting and its impact on their lives. Although the district court permitted their testimony, the court explained that its "role . . . [wa]s not to sentence Ms. Ramos for" the death of Officer Mosomillo, but to sentence her for the "breach of trust" associated with the violation of her supervised release. App'x at 18–19. For her part, Ramos focused

6

on the significant amount of time she had already spent in custody, her rehabilitation, and the difficult circumstances in her life, including the abuse she suffered at the hands of Serrano. Notably, Ramos did not dispute Probation's Guidelines calculations.

Ultimately, the district court adopted Probation's violation report without change, including its proposed Guidelines range, and sentenced Ramos to the maximum permitted term – 24 months' incarceration. In reaching that determination, the district court indicated that it considered each of the 18 U.S.C. § 3553(a) factors, and expressly mentioned, among other things, (i) that Ramos squandered the chance to turn her life around following an exceedingly lenient sentence in 1994, (ii) that Ramos was headed down "a disastrous path" "even before she met Mr. Serrano," App'x at 76, (iii) the "extremely serious" nature of Ramos's violation, *id.*, (iv) a recent disciplinary infraction that Ramos incurred while detained pending her sentencing before the district court, and (v) Ramos's declining health.

Ramos now appeals that sentence, arguing that the district court committed several procedural errors. She also requests that, in the event of vacatur and remand, her case be reassigned to a different judge for resentencing.

## II.    Standard of Review

Like any other sentence, we review a sentence for a violation of supervised release for both procedural and substantive reasonableness. *See United States v. Smith*, 949 F.3d 60, 65–66 (2d Cir. 2020). This means that we check the sentence to ensure both that the district court followed the right steps in imposing it, and that the sentence is not unreasonably harsh or unreasonably lenient. *See United States v. Chu*, 714 F.3d 743, 746 (2d Cir. 2013).

In conducting that review, we ordinarily apply a lenient "abuse-of-discretion standard." *Smith*, 949 F.3d at 66 (internal quotation marks omitted). That standard requires us to "take into account the totality of the circumstances, giving due deference to the sentencing judge's exercise of discretion, and bearing in mind the institutional advantages of district courts." *Chu*, 714 F.3d at 746 (internal quotation marks omitted).

But things change when a defendant raises an objection on appeal that she failed to raise below. In that circumstance, we review the sentence only for plain error. *See Smith*, 949 F.3d at 66. To meet the plain error standard, a defendant must establish four elements: "(1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected the appellant's

substantial rights; and (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *United States v. Balde*, 943 F.3d 73, 96 (2d Cir. 2019) (internal quotation marks omitted).[2]

### III.  Discussion

Although Ramos does not challenge the substantive length of her sentence, she argues that the district court conducted the sentencing proceeding in a procedurally unreasonable manner.

"A sentence is procedurally unreasonable if the district court fails to calculate (or improperly calculates) the Sentencing Guidelines range, treats the Sentencing Guidelines as mandatory, fails to consider the § 3553(a) factors, selects a sentence based on clearly erroneous facts, or fails adequately to explain the chosen sentence." *Smith*, 949 F.3d at 66 (internal quotation marks omitted). Ramos identifies what she believes to be two such errors. First, she claims, for the first time on appeal, that the district court improperly calculated her Sentencing

---

[2] To be sure, the typical plain error standard can often be "relaxed . . . in the sentencing context because the cost of correcting an unpreserved error is not as great as" it would be following a trial. *United States v. Haverkamp*, 958 F.3d 145, 149 (2d Cir. 2020) (internal quotation marks omitted). But we have questioned whether it is appropriate to automatically apply this "relaxed" standard in every appeal involving an unpreserved sentencing objection. *See, e.g.*, *United States v. Reyes*, 819 F. App'x 41, 43 n.2 (2d Cir. 2020); *United States v. Fuller*, 801 F. App'x 14, 16 n.3 (2d Cir. 2020); *United States v. Dupes*, 513 F.3d 338, 343 n.2 (2d Cir. 2008). We need not decide which species of plain error review applies here since the result would be the same under either one.

Guidelines range. Second, she argues that in determining what sentence would be appropriate, the district court based its decision on erroneous facts and unreasonably failed to consider relevant mitigating information. We address each argument in turn.

## A.    Ramos's Guidelines Range

"In imposing a sentence for violation of supervised release, the sentencing judge may freely impose a term lower or higher than the recommended Guidelines range, but must start with a legally correct interpretation of the Guidelines." *United States v. McNeil*, 415 F.3d 273, 277 (2d Cir. 2005). Among other things, that requires the district court to consult the policy statements contained in Chapter 7 of the Sentencing Guidelines. *See United States v. Kingdom (U.S.A.), Inc.*, 157 F.3d 133, 136 (2d Cir. 1998). Chapter 7 provides an alphabetical classification system with different recommended sentencing ranges based on the severity of the violation of supervised release. *See* U.S.S.G. § 7B1.1(a). In descending order of severity, that system classifies violations as either Grade A, B, or C. The higher the grade, the longer the suggested sentence. Formatted for clarity, the Sentencing Guidelines describe Grade A and Grade B violations, the two grades relevant here, as follows:

**(1) Grade A Violations** – conduct constituting

    **(A)** a federal, state, or local offense punishable by a term of imprisonment exceeding one year that

        **(i)** is a crime of violence,

        **(ii)** is a controlled substance offense, or

        **(iii)** involves possession of a firearm or destructive device of a type described in 26 U.S.C. § 5845(a); or

    **(B)** any other federal, state, or local offense punishable by a term of imprisonment exceeding twenty years;

**(2) Grade B Violations** – conduct constituting any other federal, state, or local offense punishable by a term of imprisonment exceeding one year.

U.S.S.G. § 7B1.1(a).

Ramos argues that the district court committed plain error by classifying her state crime as a Grade A violation, when it should have been deemed a Grade B violation. The district court's decision was driven by its determination that the offense was a "crime of violence" under § 7B1.1(a)(1)(A). But the Guidelines define an offense as a "crime of violence" only if it either "has as an element the use, attempted use, or threatened use of physical force against the person of another" or is, among other specifically enumerated crimes, "voluntary manslaughter." U.S.S.G. § 4B1.2(a). As Ramos sees it, her conviction for reckless manslaughter cannot be deemed a conviction for "voluntary" manslaughter, nor

11

did her offense categorically involve the use or threatened use of force. As a result, she asserts that her offense was not a Grade A violation and the district court thus relied on an improper Guidelines range.

Rather than dispute Ramos's assertions, the government instead points out that the Grade A classification was appropriate because, even assuming Ramos's argument on appeal is correct, the state offense that constituted the violation was "punishable by a term of imprisonment exceeding twenty years." U.S.S.G. § 7B1.1(a)(1)(B). After all, Ramos was sentenced up to life in prison, and in fact served 22 years for her offense. And it is beyond question that "[a]n error in Guidelines calculation is harmless if correcting the error would result in no change to the Guidelines offense level and sentencing range." *United States v. Cramer*, 777 F.3d 597, 603 (2d Cir. 2015).

Ramos's response is a technical one. As noted above, the maximum term of imprisonment for second-degree manslaughter is ordinarily 15 years. *See* N.Y. PENAL LAW § 70.00(2)(c). Ramos was eligible for a sentence greater than 20 years only because of her criminal history, which made her a "persistent felony offender" subject to sentencing enhancements that increased her maximum exposure from 15 years to life imprisonment. *See id.* §§ 70.00(2)(a), 70.10.

12

According to Ramos, the district court erroneously considered those sentencing enhancements when it should have limited itself to the statutory maximum sentence for a garden variety second-degree manslaughter charge.

Whether Ramos's manslaughter conviction constituted a Grade A or Grade B violation thus turns on whether a sentencing court may take recidivism enhancements into account in determining the maximum potential term of imprisonment for a crime. We have never answered that question. Fortunately, many of our sister circuits have, and all are in agreement: a recidivism enhancement is fair game for a sentencing court to consider when assessing the maximum potential penalty for an offense constituting a violation of supervised release. *See United States v. Rodriguez*, 945 F.3d 1245, 1251–52 (10th Cir. 2019); *United States v. Montgomery*, 893 F.3d 935, 940–41 (6th Cir. 2018); *United States v. Wynn*, 786 F.3d 339, 343 (4th Cir. 2015); *United States v. Seiber*, 516 F. App'x 208, 215 (3d Cir. 2013); *United States v. Trotter*, 270 F.3d 1150, 1154–56 (7th Cir. 2001); *United States v. Boisjolie*, 74 F.3d 1115, 1116–17 (11th Cir. 1996).[3]

---

[3] Ramos argues that the First Circuit broke with these decisions in *United States v. García-Cartagena*, 953 F.3d 14 (1st Cir. 2020). But *García-Cartagena* concerned what a court may consider in determining whether a violation was a "controlled substance offense" or a "crime of violence," *id.* at 16, and its analysis was driven in large measure by the definitions for those terms provided in U.S.S.G. § 4B1.2, *id.* at 16–17, 22–24. Because the issue before us concerns neither the category of crime that Ramos committed nor the definitions found in § 4B1.2, we do not see *García-Cartagena* as contrary authority.

We agree with these decisions and adopt the same rule, both because of the language of the Guidelines and because of the sentencing goals inherent in a revocation of supervised release. The Sentencing Commission's commentary indicates that a court should "consider all conduct that affects the maximum penalties for a supervised release violation," not just "the 'basic' penalty for a given offense." *Montgomery*, 893 F.3d at 940 (citing *Wynn*, 786 F.3d at 343). Indeed, as the Commission's note to § 7B1.1 provides:

> A violation of this condition may be charged whether or not the defendant has been the subject of a separate federal, state, or local prosecution for such conduct. The grade of violation does not depend upon the conduct that is the subject of criminal charges or of which the defendant is convicted in a criminal proceeding. Rather, the grade of the violation is to be based on the defendant's actual conduct.

U.S.S.G. § 7B1.1 cmt. n.1. In other words, the note "instructs that in grading a violation of supervised release, a district court may consider not only conduct for which a defendant is prosecuted in a criminal case, but all of a defendant's conduct." *Wynn*, 786 F.3d at 343. And a direction to consider "all of a defendant's conduct" naturally also includes "all conduct that affects the maximum penalties

14

for a supervised release violation."[4]  *Id.*; *see also United States v. Rodriquez*, 553 U.S. 377, 386 (2008) (explaining that "[w]hen a defendant is given a higher sentence under a recidivism statute . . . [,] 100% of the punishment is for the offense of conviction"); *Trotter*, 270 F.3d at 1154 (asking "how can one determine whether an offense is 'punishable' by a particular term without considering all of the ingredients that set the maximum punishment?").

In addition, "the very purpose of a supervised release revocation hearing is to determine the gravity of the breach of trust committed by the defendant in the context of the 'conditional liberty' [s]he was granted following h[er] conviction of the underlying offenses."  *Wynn*, 786 F.3d at 343.  That analysis "necessarily requires consideration of the defendant's criminal history" at the time the violation occurred.  *Id.*; *see also Boisjolie*, 74 F.3d at 1116 ("Using the maximum sentence under the Habitual Felony Offender Act in determining [the defendant's] violation grade is consistent with the Sentencing Guidelines' objective of achieving proportionality in sentencing through tailoring a punishment to fit the individual

---

[4] At oral argument, counsel for Ramos suggested that a recidivism enhancement *can* be considered in grading a violation, but only where the enhancement is found in the text of the provision setting the penalty for the particular crime at issue.  We find this overreliance on form to be misguided, and can discern no reason why a legislature's choice to put a sentencing enhancement in one section of a statutory scheme rather than another should affect how courts read the Guidelines.

criminal and the crime committed.").

Relatedly, we reject Ramos's assertion that considering recidivism enhancements in assessing the violation grade unfairly results in the "double counting" of past criminal convictions, once in setting the criminal history category and then again in setting the offense level. Criminal history and offense level measure two different things: "[t]he offense level represents a judgment as to the wrongfulness of the particular act," while "[t]he criminal history category principally estimates the likelihood of recidivism." *United States v. Campbell*, 967 F.2d 20, 24 (2d Cir. 1992); *cf. United States v. Gibson*, 135 F.3d 257, 261 (2d Cir. 1998) (rejecting the notion that "the use of [a defendant's] prior convictions both to enhance the Career Offender Guideline and to add criminal history points amount[s] to improper double counting"). Unsurprisingly, then, other courts of appeals that have considered this "double counting" argument in the context of grading a violation of supervised release have rejected it out of hand. *See Seiber*, 516 F. App'x at 216; *Trotter*, 270 F.3d at 1155 ("If the Guidelines' use of criminal history to influence the final sentence blocks recidivist enhancements under § 7B1.1, it logically does so for *any* offense . . . , for the use of criminal history is ubiquitous in the Guidelines. Yet this has never before been thought incompatible

16

with using prior convictions to determine maximum permissible punishments.");

*United States v. Crace*, 207 F.3d 833, 838 (6th Cir. 2000) (explaining that consideration of a recidivism enhancement in grading a violation is not improper double counting because the "single [prior] act is relevant to two dimensions of the sentencing guidelines analysis"). We do so as well.

Accordingly, we agree with our sister circuits that recidivism enhancements should enter the mix when a court is grading a violation of supervision.[5] As a result, Ramos's crime of second-degree manslaughter was "punishable by a term of imprisonment exceeding twenty years" – a Grade A violation under § 7B1.1(a)(1)(B). Any error in the district court's Guidelines calculation, then, was harmless.

**B.      Procedural Reasonableness of the Sentencing Hearing**

In addition to challenging the district court's Guidelines calculation, Ramos also asserts that the sentencing hearing was conducted in a procedurally improper manner. Again, we disagree.

---

[5] Ramos's assertion that this outcome conflicts with the rule of lenity is mistaken. The rule of lenity requires courts to resolve statutory *ambiguities* in favor of defendants, *see Mendez v. Barr*, 960 F.3d 80, 87 (2d Cir. 2020), and, as explained above, there is no ambiguity here after accounting for "the language and structure, legislative history, and motivating policies of" the Guidelines, *Moskal v. United States*, 498 U.S. 103, 108 (1990) (internal quotation marks omitted).

In practice, the procedure that a district court employs in sentencing a defendant for violating her term of supervision is nearly identical to any other sentencing. *See Smith*, 949 F.3d at 65–66. But there are two aspects unique to a sentence imposed in the revocation context that bear mentioning. First, "the degree of specificity required for the reasons behind [such] a . . . sentence is less than that for plenary sentencing." *Id.* at 66. Second, a sentence for a violation of supervised release should primarily sanction the defendant's "breach of trust," not the conduct constituting the violation itself. *United States v. Edwards*, 834 F.3d 180, 194 (2d Cir. 2016) (citing U.S.S.G. ch. 7, pt. A, introductory cmt. 3(b)). To be clear, this does not mean that a district court cannot consider the seriousness of the violation conduct. Of course it can. But that fact should be considered only "to a limited degree." *Id.* (quoting U.S.S.G. ch. 7, pt. A, introductory cmt. 3(b)).

Although Ramos puts forward over a half-dozen different arguments for why her sentencing hearing was procedurally improper, they all essentially reduce to two main points: (i) the district court based its sentencing decision on improper evidence, as it both failed to consider relevant mitigating facts and incorrectly placed significant stock in victim impact statements, and (ii) the district court primarily sentenced her based on the severity of her state offense and not

18

her breach of trust. Neither of these arguments has merit.

The district court began the proceeding by clarifying that its "role . . . [wa]s not to sentence Ms. Ramos" for the 1998 killing of Officer Mosomillo, but "to determine the appropriate punishment for [her] breach of trust" by committing a new crime while still on supervised release. App'x at 18–19. The court then explained each of the section 3553(a) factors and indicated that those factors would help guide the court's decision-making process. Then, after again reiterating the "limited purpose" of the sentencing, *id.* at 21, the court allowed various friends and family of Officer Mosomillo, including Officer Torres, to make statements on the record about how Ramos's actions had affected them.

Unsurprisingly, the victims were emotional. But while Ramos argues that the victim statements were "excessive," Ramos Br. at 36, and inappropriately influenced the district court's decision, it cannot be said that the district court abused its discretion simply by permitting these victims to share how Ramos's actions impacted their lives. For one thing, the Crime Victims' Rights Act expressly guarantees the right of victims and, in certain instances, their family members "to be reasonably heard at any public proceeding in the district court involving release, plea, sentencing, or any parole proceeding." 18 U.S.C.

§ 3771(a)(4). For another, district courts are obligated to at least consider the severity of the conduct constituting the violation in setting a sentence for a violation of supervised release, and the impact of the defendant's actions on her victims is no doubt a legitimate component of that consideration. *See* 18 U.S.C. § 3583(e) (directing courts to consider § 3553(a)(1)); *see also Smith*, 949 F.3d at 66–67 (considering the seriousness of the defendant's violation conduct in assessing whether the district court's above-Guidelines sentence was reasonable). So given the "largely unlimited discretion of a sentencing court either as to the kind of information it may consider[] or the source from which it may come," *United States v. Cacace*, 796 F.3d 176, 190–91 (2d Cir. 2015) (internal quotation marks omitted), as well as the "strong presumption that the sentencing judge has considered all arguments properly presented to h[im]," *United States v. Robinson*, 799 F.3d 196, 202 (2d Cir. 2015) (internal quotation marks omitted), we cannot say that, on the record before us, the district court improperly considered or weighed this testimony in sentencing Ramos.[6]

---

[6] In her opening brief, Ramos makes a passing argument that the district court improperly credited some of this victim testimony in violation of *Apprendi v. New Jersey*, 530 U.S. 466 (2000). But *Apprendi* concerns only factual findings that "increase[] the penalty for a crime beyond the prescribed statutory maximum." *Id.* at 490; *see also United States v. Thomas*, 274 F.3d 655, 663–64 (2d Cir. 2001) (en banc). Here, Ramos's sentence was not increased beyond the statutory maximum of 24 months.

Indeed, in ultimately concluding that a sentence of 24 months' imprisonment was appropriate, the district court identified a host of supporting reasons, many of which did not concern the severity of the violation. To start, the district court noted that it considered all the required section 3553(a) factors, which alone "reinforce[s] the presumption" that the court acted appropriately. *See United States v. Hernandez*, 604 F.3d 48, 54 (2d Cir. 2010). Next, the district court observed that Ramos "rejected" the "gift of a relatively brief prison sentence" following her narcotics smuggling conviction in 1993. App'x at 75–76. In the wake of an original sentence that was nearly 10 years below Ramos's recommended Guidelines range, Ramos's decision to violate the terms of her supervision constituted a particularly egregious breach of trust. *See United States v. Verkhoglyad*, 516 F.3d 122, 130 (2d Cir. 2008) (reasoning that the breach of trust reflected in a violation is exacerbated if the defendant received a "lenient [original] sentence[]").

The district court also pointed to a recent prison disciplinary event that occurred while Ramos was in custody pending her sentencing as evidence that Ramos still has trouble with authority figures. While Ramos suggests that this "tangent about [an] 'unmade bed'" was unreasonable, Ramos Br. at 36, we disagree. The disciplinary infraction at issue was not simply the failure to make a

21

bed, but verbal aggression against the corrections officer who called that failure to her attention. Moreover, the "fail[ure] to abide by institutional regulations" is surely relevant under section 3553(a), *United States v. Mumuni*, 946 F.3d 97, 112 (2d Cir. 2019), particularly where, as here, the defendant points to her rehabilitation as grounds for a lenient sentence. And while the prison infraction clearly was not a major driver in the district court's sentence, it was hardly improper for the court to consider the infraction along with the constellation of other facts before it.

As for Ramos's contention that the district court failed to appropriately consider mitigating factors, that too is simply incorrect. The parties discussed such information at length, including the domestic violence Ramos suffered at the hands of Serrano and her declining health. *See United States v. DiRose*, 586 F. App'x 808, 810 (2d Cir. 2014) (explaining that a discussion of the relevant issues by the parties "reinforce[d] the presumption that the district court took all of the required factors into account"). And while the district court was not obligated to exhaustively list on the record every fact it considered in imposing Ramos's sentence, *see United States v. Pugh*, 945 F.3d 9, 25 (2d Cir. 2019), it expressly referenced several of these mitigating circumstances.

For instance, the district court acknowledged that Serrano played some role

in exacerbating the "disastrous path" that Ramos found herself on in 1998. App'x at 76. It also credited Ramos's expressions of remorse for her actions. And, finally, the court discussed the "particular difficulty" it faced in sentencing Ramos given her declining health. *Id.* at 77. In fact, the district court delayed Ramos's sentencing for more than a week because the court wanted "to hear more about [her] medical condition." *Id.* at 108. The district court expressly considered and weighed these mitigating circumstances. It was within the court's discretion to assign the weight to be given to them in balancing the many considerations relevant to selecting the appropriate sentence.

At bottom, Ramos engaged in a serious violation of the terms of her supervised release after having been the beneficiary of a remarkably lenient sentence in 1994. While the seriousness of her violation, and the carnage it caused, were undoubtedly a major focus of the evidence submitted to the district court at the sentencing hearing, the court repeatedly explained that its role was to punish Ramos's breach of trust and that its sentencing decision would be driven by a holistic assessment, which included the applicable section 3553(a) factors. Considering the record as a whole, we cannot say that the district court imposed a procedurally unreasonable sentence.

## IV. Conclusion

For the foregoing reasons, we **AFFIRM** the judgment of the district court.